that Fester's counsel did not provide ineffective assistance in this regard.

## CONCLUSION

For all of the foregoing reasons, we affirm the decision of the district court denying postconviction relief.

Affirmed.

———————————

Dowayne Peterson, appellant, v. Homesite Indemnity Company, a Kansas corporation, appellee.

___ N.W.2d ___

Filed December 20, 2013.    No. S-12-875.

1. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

2. ____: ____. An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

3. **Insurance: Contracts: Judgments: Appeal and Error.** The interpretation of an insurance policy presents a question of law that an appellate court decides independently of the trial court.

4. **Summary Judgment.** Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

5. ____. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute.

6. ____. If a genuine issue of fact exists, summary judgment may not properly be entered.

7. **Summary Judgment: Proof.** The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law.

8. **Bailment: Words and Phrases.** Bailment is defined as the delivery of personal property for some particular purpose or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it or otherwise dealt with according to that person's directions or kept until reclaimed, as the case may be.

9.  ____: ____. Bailment involves the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished.

10. **Conversion: Words and Phrases.** Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time.

Appeal from the District Court for Sarpy County: Max Kelch, Judge. Reversed and remanded for further proceedings.

Ralph A. Froehlich, of Locher, Pavelka, Dostal, Braddy & Hammes, L.L.C., for appellant.

Thomas A. Grennan and Andrew J. Wilson, of Gross & Welch, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## I. NATURE OF CASE

This case presents the issue whether Dowayne Peterson suffered a loss of personal property due to theft, as defined in his homeowner's insurance policy. The question presented in this appeal is whether there is a material issue of fact in dispute.

Peterson contracted with a "shipper agent" to move his household goods and personal property from Nebraska to Florida. Individuals contacted by the shipper agent took possession of Peterson's property and demanded additional payment before delivery of the property to Florida. The property was never delivered to Florida or returned to Peterson.

Peterson's insurer, Homesite Indemnity Company (Homesite), denied coverage, claiming that a theft had not occurred. The district court found no material issues of fact in dispute and concluded that a theft had not occurred. It granted summary judgment in favor of Homesite.

Because there are genuine issues of material fact whether there was a theft, we reverse the judgment of the district court and remand the cause for further proceedings.

## II. SCOPE OF REVIEW

[1] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Shada v. Farmers Ins. Exch.*, 286 Neb. 444, ___ N.W.2d ___ (2013).

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Id.*

[3] The interpretation of an insurance policy presents a question of law that we decide independently of the trial court. *Alsidez v. American Family Mut. Ins. Co.*, 282 Neb. 890, 807 N.W.2d 184 (2011).

## III. FACTS

In August 2007, Peterson obtained a homeowner's insurance policy from Homesite for his apartment in Bellevue, Nebraska. This policy insured against the "direct physical loss" of Peterson's personal property or that of his immediate family when caused by any of 16 listed perils, including theft. The term "theft" was not defined.

Peterson owned a house in Florida. On July 15, 2008, Peterson contacted United States Van Lines of Texas (USVLT) to move his personal property from Bellevue to Florida. He entered into a contract that provided for the disassembly, loading, transport, unloading, and reassembly of up to 8,000 pounds of household goods for an estimated cost of $3,845.37.

The final cost for the move would be determined based on the actual weight of the shipment. If "any additional pieces, packing services, weight or labor services [were] added at the origin or destination to those quoted," Peterson would be charged additional amounts. Peterson waived his right to have USVLT perform a visual estimate and instead prepared an

inventory of the items to be moved, which USVLT then used to calculate the estimated cost.

The contract provided that USVLT was to serve only as the "moving coordinator/shipper agent" and would not physically move Peterson's property. USVLT was "not responsible for any acts or omissions of the Carrier or its employees or agents." Peterson was "subject to all applicable laws and the general terms and conditions of the Carrier," which included a requirement that he "may not receive possession of [his] goods until all charges are paid in full."

On Friday, August 15, 2008, men named "Arthur" and "Earl" arrived at Peterson's apartment in a U-Haul truck. They identified themselves as being with USVLT. Peterson was concerned because they had arrived in a U-Haul instead of "a long moving truck." USVLT confirmed that it had sent Arthur and Earl to complete Peterson's move and explained that their normal moving truck had broken down. USVLT arranged for Desmond Campbell—Arthur and Earl's superior—to call Peterson with reassurance that the U-Haul would hold all of Peterson's property. But everything did not fit in the U-Haul, and Campbell arranged for a second truck to load the remainder of Peterson's property. Arthur agreed to tow Peterson's wife's vehicle behind the U-Haul, for which Peterson paid $500 cash.

Arthur and Earl left around noon on Saturday, August 16, 2008, with the full U-Haul and the vehicle. They expected to deliver Peterson's property to his residence in Florida on Sunday. On Saturday night, a Budget truck arrived to move the remainder of Peterson's property. Once Peterson received verification from Campbell that the men with the truck worked for Campbell, the two men loaded the remaining items and left. For simplicity, we refer to Arthur, Earl, and the two men in the second truck collectively as "the movers."

On August 15 and 16, 2008, Peterson signed numerous documents given to him by the movers. These documents indicated that the movers and their superior, Campbell, were associated with two moving companies based in Georgia: Move Direct Relocation and Advance Budget Moving & Storage. None of

the paperwork provided by the movers was from USVLT, but USVLT confirmed that it had sent the movers.

After several delays in delivery, Campbell informed Peterson that the shipment weighed 4,000 pounds more than estimated and that Peterson owed an additional $5,100. Peterson thought the alleged weight of the shipment was "an outrageous amount" and asked for documentation of the weight. Under the USVLT contract, Peterson had agreed to pay approximately $3,800 for the transport of 8,000 pounds of personal property.

As documentation of the weight of Peterson's shipment, Campbell faxed four weigh tickets to USVLT, which in turn faxed the weigh tickets to Peterson. The weigh tickets related to at least three different trucks, but only two had been used in the move. One weigh ticket described a semi-trailer, not the small rental trucks, and originated from a weigh station in Indiana. It was unclear whether the weight of the vehicle being towed by the movers was included in the weigh tickets. Three of the four weigh tickets were dated before Peterson's move. Because Peterson found "serious discrepancies" in the weigh tickets that "indicated that the documents were not reliable," he said that he would pay an additional amount only after he was satisfied as to the weight of the shipment.

Peterson proposed that Campbell meet Peterson's wife at a weigh station in Florida to verify that Peterson's shipment was in fact over the estimated weight. Campbell rejected the proposal and stated that he would not deliver Peterson's property unless and until Peterson paid an additional amount in advance of delivery. USVLT asked Campbell to comply with Peterson's request to weigh the truck in the presence of Peterson's wife, but Campbell said that he would not "deliver anything until [he got his] money." On August 21, 2008, USVLT refused to assist Peterson further in securing delivery of his property.

On August 22, 2008, Peterson again attempted to get his property from Campbell by assuring payment upon delivery. Campbell continued to demand payment before delivery and stated that Peterson's property was being stored in Georgia.

Peterson did not send additional money and did not receive any of his personal property.

Peterson filed a claim with Homesite under his homeowner's insurance policy. Homesite sent Peterson an initial payment of $2,000 but later denied his claim. Peterson received $25,000 for the loss of personal property and $5,000 for the loss of his vehicle under separate insurance policies with another insurance company.

Peterson sued Homesite for breach of contract and bad faith in denying the insurance claim. In response, Homesite asserted multiple affirmative defenses, including the allegation that Peterson lost his property as a result of a contract dispute, not theft. It counterclaimed to recover the $2,000 it had advanced to Peterson.

Homesite moved for summary judgment. After a hearing at which both parties adduced evidence, the district court sustained the motion. It found that Peterson lost his property in a contractual dispute after voluntarily delivering the property into the custody of USVLT and that there was "no showing of criminal intent." The court sustained Homesite's motion for summary judgment and dismissed Peterson's complaint with prejudice. It later dismissed Homesite's counterclaim without prejudice.

Peterson timely appeals. Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the case to our docket. See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

## IV. ASSIGNMENTS OF ERROR

Peterson assigns, restated, that the district court erred in granting Homesite's motion for summary judgment by (1) making factual findings where genuine issues of material fact exist and failing to give him the benefit of all reasonable inferences deducible from the evidence, (2) concluding that no theft had occurred because "a contractual dispute arose" after he "voluntarily delivered" his property into the custody of USVLT, and (3) dismissing his cause of action for bad faith.

## V. ANALYSIS

[4-6] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Shipley v. Department of Roads*, 283 Neb. 832, 813 N.W.2d 455 (2012). Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute. *Young v. Govier & Milone*, 286 Neb. 224, 835 N.W.2d 684 (2013). If a genuine issue of fact exists, summary judgment may not properly be entered. *Cartwright v. State*, 286 Neb. 431, 837 N.W.2d 521 (2013).

[7] The party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must produce sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law. *Id*. After the movant for summary judgment makes a prima facie case by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence was uncontroverted at trial, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id*. In the summary judgment context, a fact is material only if it would affect the outcome of the case. *Professional Mgmt. Midwest v. Lund Co.*, 284 Neb. 777, 826 N.W.2d 225 (2012).

### 1. Summary Judgment on Breach of Contract Claim

Peterson claims that the district court erred by making factual findings on genuine issues of material fact. We therefore examine what are the material facts in Peterson's breach of contract claim against Homesite. The material facts are those facts that relate to the alleged theft of Peterson's property. In order to consider what facts are material to Peterson's claim, we must first determine what definition of theft is applicable to Peterson's homeowner's insurance policy.

### (a) Definition of Theft
### Under Peterson's
### Insurance Policy

An insurance policy is a contract, and its terms provide the scope of the policy's coverage. *Rickerl v. Farmers Ins. Exch.*, 277 Neb. 446, 763 N.W.2d 86 (2009). In construing an insurance contract, a court must give effect to the instrument as a whole and, if possible, to every part thereof. *Travelers Indemnity Co. v. International Nutrition*, 273 Neb. 943, 734 N.W.2d 719 (2007). We construe insurance contracts like other contracts, according to the meaning of the terms that the parties have used. *Federated Serv. Ins. Co. v. Alliance Constr.*, 282 Neb. 638, 805 N.W.2d 468 (2011). "In cases of doubt, [an insurance policy] is to be liberally construed in favor of the insured." *Modern Sounds & Systems, Inc. v. Federated Mut. Ins. Co.*, 200 Neb. 46, 49, 262 N.W.2d 183, 186 (1978).

The relevant provisions of Peterson's homeowner's insurance policy are:

> We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in SECTION I - EXCLUSIONS.
>
> . . . .
>
> 9. **Theft**, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

(Emphasis in original.) However, the policy did not define theft. There were several specific exclusions, such as theft by an insured, that were not covered under the theft provision, but none of those exclusions apply to Peterson's situation.

In the absence of an explicit definition for the term "theft," we examine the policy to determine what definition is applicable. The district court applied the definition of theft from *Modern Sounds & Systems, Inc., supra*, and we agree that this definition of theft applies to Peterson's policy.

In *Modern Sounds & Systems, Inc.*, 200 Neb. at 48, 262 N.W.2d at 185, we examined an insurance policy that "provided that the defendant would pay for any loss 'caused by

theft or larceny.'" We held that "in an automobile insurance policy providing coverage against theft, in which the term is not defined, the term 'theft' will be construed broadly to include a loss caused by any unlawful or wrongful taking of the insured vehicle with criminal intent." *Id*. at 52, 262 N.W.2d at 187.

Similar to Peterson's policy quoted above, the policy language in *Modern Sounds & Systems, Inc., supra*, identified a specific peril for which coverage was provided. Under a specific perils policy, also called a named perils policy, property is covered only if the occurrence arises from one of the perils listed in the policy. See *Poulton v. State Farm Fire & Cas. Cos.*, 267 Neb. 569, 675 N.W.2d 665 (2004). In *Modern Sounds & Systems, Inc.*, 200 Neb. at 48, 262 N.W.2d at 185, "'theft or larceny'" was a listed peril for which coverage was provided under the insurance policy. In the instant case, "theft" was a listed peril. *Modern Sounds & Systems, Inc., supra*, involved the interpretation of a particular policy, but we considered the definition of theft within the broader context of all specific perils policies.

Neither of the parties disputes the facts that Peterson had a specific perils policy with Homesite, that the policy generally covered theft, and that his policy did not define theft. Because Peterson's homeowner's insurance policy was a specific perils policy that failed to define theft, we apply a broad definition to the term "theft," just as we did in *Modern Sounds & Systems, Inc., supra*.

Homesite claims a narrow application of the term "theft" should be applied because the policy allegedly demonstrated the parties' desire for theft to be defined narrowly. According to Homesite, because Peterson's policy had no exclusions, we should conclude that "the term theft is not meant to be used in a broad sense." Brief for appellee at 12. We are not persuaded by this argument.

Peterson's policy had exclusions to theft coverage—the policy listed six occurrences of theft that were not covered. Just as in *Modern Sounds & Systems, Inc. v. Federated Mut. Ins. Co.*, 200 Neb. 46, 262 N.W.2d 183 (1978), those limited exclusions indicate that the term "theft" covered all occurrences

of theft other than the six specifically listed and would have covered those occurrences but for the exclusions. Additionally, Peterson's policy provided coverage against the loss of property resulting from "[t]heft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen." (Emphasis omitted.) This language, including attempted theft and likely theft, indicates that the parties intended a broad meaning of theft within Peterson's policy. Even if this were not clear, "[i]n cases of doubt, [an insurance policy] is to be liberally construed in favor of the insured." *Id*. at 49, 262 N.W.2d at 186.

Despite Homesite's arguments, we find that applying this broad definition to Peterson's homeowner's insurance policy would not be contrary to the intent of the parties to that policy. Therefore, using the broad definition of theft in *Modern Sounds & Systems, Inc., supra*, we interpret the theft provision in Peterson's policy to cover any loss of the insured's personal property caused by an unlawful or wrongful taking with criminal intent.

### (b) Whether Genuine Issues
### of Material Fact Exist

Given the applicable definition of theft, to ultimately succeed on his claim of theft, Peterson must prove that (1) he suffered a loss (2) caused by the unlawful or wrongful taking of the insured property (3) with criminal intent. Intent "must be determined from the particular circumstances of each case." 10A Lee R. Russ et al., Couch on Insurance 3d § 151:15 at 151-24 (2005). Thus, the material facts are those that relate to whether there was an unlawful or wrongful taking of the property with criminal intent.

### (i) Homesite's Evidence

Homesite argues that it was entitled to summary judgment because Peterson did not suffer a loss due to theft. It claims Peterson did not suffer a theft because the evidence showed that he was embroiled in a contract dispute with Campbell and the movers, to whom Peterson had entrusted his property in a bailment.

[8,9] Bailment is defined as

the delivery of personal property for some particular purpose or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it or otherwise dealt with according to that person's directions or kept until reclaimed, as the case may be.

*Gerdes v. Klindt*, 253 Neb. 260, 268, 570 N.W.2d 336, 342 (1997). Nebraska case law also states that bailment involves the "delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed and the property returned or duly accounted for when the special purpose is accomplished." *Id.* at 268, 570 N.W.2d at 342-43. The law of bailments generally applies to "the delivery and acceptance of custody of personal property for safekeeping, transportation, or storage." 8A Am. Jur. 2d *Bailments* § 5 at 525 (2009).

Homesite adduced evidence that the agreement between Peterson and the movers constituted a bailment. Peterson delivered his property to Campbell and the movers for the express purpose of having the property transported to Florida. The reason for Peterson's arrangement with USVLT was the transportation and delivery of his personal property to Florida. According to Homesite's evidence, Campbell and the movers acknowledged that they were given possession of Peterson's property in accordance with the USVLT contract and for that same purpose—delivery to Florida. Such evidence would establish the existence of an agreement between Peterson and the movers that once the property had been transported, the movers would redeliver possession of the property to Peterson at his house in Florida. This arrangement meets the basic definition of a bailment.

Because Homesite adduced evidence that if uncontroverted, would establish a bailment, we examine the legal implications of bailment to this case. Homesite argues that because Peterson voluntarily gave his property to the movers as part of a bailment, there can be no theft under his homeowner's insurance policy. It argues that the existence of a bailment situation

necessarily makes the dispute between Peterson and the movers a "contract dispute" for which Peterson cannot recover. Brief for appellee at 15. These arguments ignore the fact that the person entrusted with bailed property (the bailee) is limited in what he or she can do with such property.

[10] Under a bailment, the person delivering the property for a specific purpose (the bailor) has "the right to have the bailed property returned to him or her strictly in accordance with the terms of the bailment contract." 8A Am. Jur. 2d, *supra*, § 130 at 654. If the bailee "fails or refuses to return the property in the manner expressly required by the contract," he or she "may be liable for conversion, or for breach of contract." *Id*. In Nebraska, a bailee who handles bailed property in a manner that is in breach of the bailment agreement—that is, in a manner other than that required by the contract—commits conversion. See *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990). Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time. *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013).

In the instant case, the fact that Campbell and the movers initially obtained possession of Peterson's property with his consent does not preclude the possibility that they may have intended to convert the property for their own use. Because Peterson delivered possession of his property to Campbell and the movers for a specific purpose, any actions by the movers that were contrary to that purpose went beyond the scope of Peterson's initial consent and could be a theft.

In the absence of a provision specifically excluding conversion from theft coverage, Peterson's homeowner's insurance policy encompasses theft by conversion. The policy does not exclude conversion from theft coverage, and therefore, conversion falls within the broad definition of theft in Peterson's policy.

Homesite's evidence of bailment showed that Campbell and the movers took possession of Peterson's property for the specific purpose of transporting and delivering it to Florida. It

also showed that once Campbell and the movers obtained possession of Peterson's property in the context of a bailment, they kept the property according to what they asserted to be their contractual rights. If this evidence were uncontroverted, there is no showing that a theft occurred.

The contract with USVLT provided the carrier would not deliver the goods until all charges were paid in full. Through evidence that USVLT acknowledged sending the movers to transport Peterson's belongings and that Campbell was their superior, Homesite established that Campbell was "the Carrier" referenced in the USVLT contract. Therefore, if this provision in the contract was lawful, Campbell and the movers were not prohibited by Peterson's contract with USVLT from retaining possession of Peterson's property until Peterson paid in full.

Homesite presented evidence that Campbell kept Peterson's property because Campbell claimed Peterson owed more money. If uncontroverted, this evidence would support findings that Campbell and the movers did not keep Peterson's property with criminal intent and that their continued possession of Peterson's property was based on their contractual right to deliver the property only after Peterson paid in full. In the absence of an unlawful taking with criminal intent, no theft occurred. And if no theft occurred, Homesite did not breach its contract with Peterson by denying his claim. Therefore, Homesite made a prima facie case that it was entitled to judgment as a matter of law on the breach of contract claim.

### (ii) Peterson's Evidence

Once Homesite made its prima facie case, the burden shifted to Peterson to show the existence of genuine issues of material fact that would prevent judgment as a matter of law. See *Cartwright v. State*, 286 Neb. 431, 837 N.W.2d 521 (2013). Peterson met this burden by presenting evidence from which it could reasonably be inferred that Campbell's actions were committed with criminal intent and not with the commercial intent suggested by Homesite. Per our standard of review, we view this evidence in a light favorable to Peterson.

See *Shada v. Farmers Ins. Exch.*, 286 Neb. 444, ___ N.W.2d ___ (2013).

Peterson adduced evidence showing that the movers' actions leading up to and during Peterson's move on August 15 and 16, 2008, cast doubt upon their affiliation with legitimate businesses engaged in the interstate transportation of household goods. USVLT's contract with Peterson explained that USVLT would engage a carrier to move Peterson's personal property, but the contract did not name the carrier. Indeed, USVLT never disclosed which carriers it used, in violation of federal regulations. See 49 C.F.R. § 371.109(a) (2012). The contract also provided that the carrier could withhold delivery until Peterson paid in full. In light of the fact that Peterson opted to receive a binding estimate from USVLT, this provision allowing the carrier to withhold delivery may have been prohibited by federal law. See 49 C.F.R. § 375.403(a)(8) through (10) (2012). Peterson was asked to initial next to each of these provisions in addition to signing at the bottom of the contract.

The evidence showed that the information Peterson had about the movers' affiliation with USVLT or any legitimate carrier was questionable. Upon arrival in Bellevue, the movers presented Peterson with paperwork from two separate moving companies in Georgia, neither of which was registered to do business in Georgia. The telephone numbers provided on the paperwork were disconnected, and the addresses on the paperwork corresponded to vacant lots that were for sale. On the first day of the move, Peterson reached the individual allegedly in charge of these companies—Campbell—only after USVLT referred him to a different telephone number, which in turn directed him to a third number. Peterson was able to reach Campbell and the movers only via cell phone. The movers did not offer any paperwork indicating a connection with USVLT. And when Peterson asked for identification, they did not provide it. Under the federal regulations governing interstate carriers of household goods, the movers were required to provide at least their names, addresses, and U.S. Department of Transportation numbers. See 49 C.F.R. § 375.501(a)(1) (2012).

As described by Peterson, the performance of the movers was not what one would expect from employees of a professional moving company. On the first day of the move, the movers arrived in a small rental truck, despite a prior arrangement for "a long moving truck." Even after Peterson told them that his personal property was located in an apartment and two garages, the movers and Campbell assured Peterson that they could fit his belongings in the small rental truck. When the movers realized later that Peterson's belongings would not fit into the small rental truck, they arranged for a second rental truck, which did not arrive until the evening of August 16, 2008, and did not finish loading Peterson's property until midnight.

The business of transporting household goods through interstate commerce is highly regulated, see 49 C.F.R. § 375.101 et seq. (2012), and yet, Campbell and the movers seemed unprepared to carry out Peterson's move professionally and in compliance with federal law. Given that they represented themselves as professional movers affiliated with USVLT and two moving companies from Georgia who engaged in the interstate transport of household goods, the actions of Campbell and the movers leading up to Peterson's move were highly suspect.

Once the movers had possession of Peterson's property, the reason for their dubious actions became almost immediately apparent. Within a day, the movers called Peterson to delay delivery. And a few days later, Campbell called Peterson and demanded additional money because Campbell claimed that the shipment was over the estimated weight. For the initial move of 8,000 pounds, USVLT charged Peterson about $3,800, or approximately $1,900 to move 4,000 pounds. Once in possession of Peterson's property, Campbell demanded $5,100 for the additional 4,000 pounds—almost three times as much as Peterson had paid per pound under the initial estimate. Furthermore, Campbell wanted Peterson to send the additional funds to an unidentified post office box in Georgia, refused Peterson's offer of a cashier's check, and would accept only cash or a wire transfer.

Peterson adduced evidence that Campbell was unwilling to provide Peterson with accurate documentation to support the demand for additional money. When Peterson asked for documentation that the shipment was overweight, Campbell provided weigh tickets that contained many discrepancies. One weigh ticket described the truck being weighed as a semi-trailer, which the U-Haul and Budget trucks were not. That weigh ticket was from a weigh station in Indiana, which was not close to the route Peterson told the movers to take to Florida. Based on the identification numbers printed on each ticket, the four weigh tickets related to at least three different trucks, when only two trucks were used to transport Peterson's property. And three of the four weigh tickets were dated *before* Peterson's move. Peterson stated that when confronted with these discrepancies, Campbell "was not able to give [Peterson] a satisfactory explanation." One of the movers denied being in Indiana or signing a weigh ticket from there. Campbell and Arthur also provided conflicting accounts whether the weigh tickets included the weight of the vehicle being towed by the U-Haul.

In light of the unusual weigh tickets, Peterson promised to make additional payment when he was satisfied of the actual weight of his property and asked Campbell to reweigh the shipment in the presence of Peterson's wife. USVLT ordered Campbell, as its carrier, to reweigh the shipment, but Campbell refused to reweigh Peterson's shipment or attempt delivery. Under 49 C.F.R. §§ 375.513 and 375.517 (2012), as a carrier, Campbell was required to grant Peterson's requests to have his property reweighed in person.

At one point, Campbell agreed to confirm that he was still in possession of Peterson's belongings, but failed to follow through. A police officer in Georgia claimed that Campbell showed the officer where Peterson's property was being stored, but the officer never confirmed that Peterson's property was in fact being stored there and could not locate Peterson's wife's vehicle.

The evidence supports an inference that Campbell and the movers acted with criminal intent in obtaining possession of

Peterson's property under the auspices of a legitimate bailment to transport property. Campbell and the movers claimed to be associated with supposedly legitimate moving companies, yet failed to provide valid business addresses or business telephone numbers. They arrived in rented trucks that were too small for the job described in the USVLT contract. Furthermore, the contract signed by Peterson and USVLT contained provisions contrary to federal law and conveniently put Campbell and the movers in a position where they could hold on to Peterson's property simply by claiming that he owed additional money. Campbell and the movers made precisely such a claim within a few days of loading Peterson's property. From that point forward, they refused to deliver the property, even when Peterson offered to pay the additional amount demanded in the generally accepted form of a cashier's check.

Looking back upon the movers' actions in Bellevue with knowledge of the later events, it can reasonably be inferred that acquiring possession of Peterson's property under the auspices of a bailment was the means of gaining leverage that could later be used to make a demand for additional money. Such facts support the inference that Campbell and the movers obtained possession of the property by false pretenses, in which case a bailment may not have been created in the first place. See, e.g., *Reserve Ins. Co. v. Interurban &c. Lines*, 105 Ga. App. 278, 124 S.E.2d 498 (1962). But more important, this evidence supports an inference that Campbell and the movers unlawfully took Peterson's property with criminal intent.

The evidence also supports the inference that Campbell and the movers had no intention of completing the move as required by their bailment agreement with Peterson. They demanded an additional $5,100, claiming the load exceeded the estimated weight by 4,000 pounds. When asked for confirmation of the excess weight, they produced false weigh tickets that related to more trucks than were involved in the move and that were dated several weeks prior to the move. Peterson still agreed to pay $5,100 if Campbell would reweigh the trucks at a licensed weigh station in the presence of Peterson's wife, but Campbell refused to do so. Campbell stated that he would not deliver the

property until Peterson mailed $5,100 in cash to a post office box in Georgia. Peterson offered to obtain a cashier's check that he would give to Campbell upon delivery, but Campbell demanded cash or a wire transfer. Peterson offered multiple times to meet Campbell's demands in a manner that ensured both delivery of the property and payment for the additional 4,000 pounds—a "win-win" situation if both parties were acting upon legitimate business motives.

### (iii) Conclusion

Viewing the evidence in the light most favorable to Peterson, we determine there are reasonable inferences that Campbell and the movers wrongfully took Peterson's property with criminal intent when they took Peterson's property under the auspices of a bailment and when they refused delivery in an attempt to elicit additional money from Peterson. Such inferences demonstrate the existence of a genuine issue of material fact as to whether a theft occurred. If a genuine issue of fact exists, summary judgment may not properly be entered. *Cartwright v. State*, 286 Neb. 431, 837 N.W.2d 521 (2013). Therefore, the district court erred in granting Homesite's motion for summary judgment on the breach of contract claim.

## 2. Summary Judgment on Bad Faith Claim

Peterson also alleges that the district court erred in entering summary judgment in Homesite's favor on his claim for bad faith. The court granted summary judgment against Peterson on his bad faith claim for the reason that it had determined no theft had occurred. Because the finding that there was no theft was error, it was also error for the court to grant summary judgment on the bad faith claim.

## VI. CONCLUSION

For the foregoing reasons, we reverse the order of the district court which granted summary judgment in favor of Homesite on the breach of contract and bad faith claims, and we remand the cause for further proceedings.

Reversed and remanded for further proceedings.